IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

NO. 7:10-CV-00004-FL

| | | |
|---|---|---|
| MICHAEL MANUEL and DOROTHY MANUEL, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | **MEMORANDUM & RECOMMENDATION** |
| JOSEPH A. GEMBALA, III, et al., | ) ) | |
| Defendants. | ) | |

This cause comes before the Court upon Defendants Joseph A. Gembala's, III, Joseph A. Gembala, III & Associates's, and Michael Malone's motions to dismiss (DE-69, DE-71) Plaintiffs' second amended complaint. Pursuant to 28 U.S.C. § 636(b)(1), the motions to dismiss have been referred to the undersigned for entry of a memorandum and recommendation. After the motions to dismiss were filed, Plaintiffs filed a notice of voluntary dismissal without prejudice as to Defendants Joseph A. Gembala, III and Joseph A. Gembala, III & Associates. (DE-78). Thus, to the extent that it remains viable, the undersigned RECOMMENDS that the motion to dismiss (DE-69) by Defendants Joseph A. Gembala, III and Joseph A. Gembala, III & Associates be GRANTED and the second amended complaint be DISMISSED without prejudice to Plaintiffs. For this reason, the remainder of the memorandum and recommendation will address only the allegations and claims asserted against Defendant Michael Malone.

1

For the reasons stated herein, the undersigned RECOMMENDS that the remaining motion to dismiss (DE-71) be denied.

## I. BACKGROUND

This is a civil action brought under the Racketeer Influence and Corrupt Organizations Act, commonly referred to as RICO, against a company selling "mortgage modification" services to financially distressed homeowners, including Plaintiffs. The alleged facts, as viewed in the light most favorable to Plaintiffs, are as follows:

Defendant Michael Malone ("Malone") and Christopher Frisch ("Frisch") are the founders of Secure Property Solutions, LLC ("SPS"), a limited liability company incorporated under New Jersey law in July of 2007. Sec. Am. Compl. ¶¶ 14, 16, DE-65. In early April of 2009, Malone and Fisch entered into an agreement with Pennsylvania attorney Joseph Gembala, III ("Gembala"), and his law firm, Joseph Gembala, III & Associates ("JAGA"), to conduct a "mortgage modification" business, i.e., to advertise that SPS and JAGA/Gembala had the ability to negotiate with lenders for reduced mortgage payments, lower interest rates, or other favorable changes to homeowners' mortgage obligations. *Id.* at ¶ 27. At the time, Malone, Frisch, and Gembala knew that it was illegal to form and operate a "mortgage modification" business in New Jersey without proper licensing. *Id.* at ¶¶ 22-26. While attorneys are exempt from this licensing requirement unless they are principally engaged in debt adjusting, nonlawyer individuals and organizations are not, and lawyers may not assist such persons in any way to violate the law, and may not use or allow to be used their names, images, qualifications, and

2

credentials to market unlicensed adjustment activity. *Id.* at ¶ 25. Gembala, Malone, and Frisch agreed to charge SPS customers advance fees, knowing they had no capability to obtain mortgage modifications, and they did not hire or plan to hire any persons who could do so. *Id.* at ¶¶ 29-30, 73. Instead, they agreed that SPS would hire untrained sales representatives and "processors" who could sell "mortgage modification" services to as many customers as possible from SPS's office in New Jersey by means of telephone calls to and from customers in other states. *Id.* at ¶ 31. Malone and Frisch agreed to manage SPS's day-to-day activities, hire, fire, and supervise SPS employees and contractors, and maintain SPS's New Jersey office and the equipment and customer files therein. *Id.* at ¶ 39. They also agreed to use JAGA's credentials and prestige in SPS advertising, and to advertise SPS as Gembala's and JAGA's "processing center." *Id.* at ¶ 28. In this way, Gembala, in JAGA's name, would receive all payments from customers, deposit the funds in one of his trust accounts, and regularly wire the money to SPS, less a commission. *Id.* at ¶ 36.

Pursuant to this agreement, SPS began advertising its unlicensed "mortgage modification" services on its website in April of 2009. *Id.* at ¶ 52. SPS used interstate phone calls and interstate emails to misrepresent SPS's capability to modify mortgages. *Id.* at ¶ 76. For example, SPS employees falsely claimed, among other things, that SPS was licensed and bonded; could enable customers to stop making mortgage payments; and that SPS would not take the case if it did not think it could get a modification. *Id.* SPS employees often quoted a reduced mortgage payment amount or reduced interest rate

3

or both, and claimed that SPS would definitely be able to achieve that result. *Id.* at ¶ 76. After signing a customer, SPS sent by mail a set of forms to fill out, listing income and assets, expenses and liabilities, lender contacts, and other seemingly pertinent but actually useless information. *Id.* at ¶ 78. When the forms were returned, SPS often did nothing with the documents other than to file them away in its office. *Id.* at ¶ 81. When customers called or emailed to ask about their modifications, SPS told them various falsehoods such as "the paperwork never got here;" "it was incorrect/incomplete;" "we're working on it;" "we can't find it;" "it's out of date and you need to fill out a new set;" "we need your latest pay stubs or W-2s;" or, "we did your modification as promised and you should be hearing from the lender soon." *Id.* at ¶ 82. SPS also instructed customers to stop paying their mortgages, telling them that SPS and/or Gembala were "handling it all" and anything the customer did or paid "would only mess things up." *Id.* at ¶ 85. Following this advice, at least fifty customers lost their homes to foreclosure when they stopped paying their mortgages and discovered too late that SPS had done nothing for them. *Id.* at ¶ 86.

Plaintiffs Michael and Dorothy Manuel jointly owe a mortgage on their marital residence in North Carolina to Vanderbilt Mortgage & Finance, Inc. ("Vanderbilt"). Sec. Am. Compl. ¶ 124. Around May of 2009, Plaintiffs began experiencing financial difficulties. *Id.* at ¶ 125. Concerned that they would be unable to meet their monthly mortgage payments, Plaintiffs contacted Vanderbilt and attempted to negotiate a

4

reduction or altered payment schedule for their mortgage. *Id.* at ¶ 126. Vanderbilt refused to lower the mortgage or alter the required monthly payment schedule. *Id.*

Plaintiffs searched on the Internet for debt consolidation companies and found the website for SPS. *Id.* at ¶ 126. The SPS website included the following information:

> **LOAN MODIFICATION**
>
> The processing center of Secure Property Solutions has been contracted by the Law Firm of Joseph A. Gembala, III & Associates to assist homeowners who are behind on their mortgage payments and\or are facing mortgage foreclosure. Due to the current economic crisis, the number of homeowners who are in default or are facing foreclosure has increased drastically. Together Joseph A. Gembala, III & Associates and the processing center, Secure Property Solutions, LLC, have helped countless homeowners during this difficult time through the process of a loan modification.
>
> **Contact** Secure Property Solutions to discuss the possibility of a loan modification. Almost any homeowner who is struggling with mortgage payments may be a candidate for the granting of a loan modification.
>
> **Benefits of a loan modification, if granted, may result in any or all of the following**:
>
> - Lowering your monthly mortgage payment
> - Forgiveness of your past due payments
> - Lowering your interest rate to a fixed interest rate
> - Reduction of the principal balance
> - Stopping the foreclosure process
>
> **Why you need an experienced real estate attorney:**
>
> - Bank loss mitigation specialists are skilled negotiators and need to protect the interest of the bank
> - The loan modification is a legal process and, if not handled properly, may make things worse for you in the long run

- Our attorneys and negotiators have extensive experience negotiating with banks and they understand state and federal laws as well as lending regulations
- Our attorneys can use the Truth in Lending Act (TILA) and the Real Estate and Settlement Procedures Act (RESPA) to your advantage
- Banks listen to attorneys because they know the law

Don't wait any longer. Timing is vital with the lenders. Contact Secure Property Solutions to stop the foreclosure process and save your home. Our experienced team will gather all of the necessary information to present your case to the lender's loss mitigation negotiator and work diligently to achieve a successful loan modification in a fast and efficient manner. The sooner you take action the better.

Sec. Am. Compl. ¶ 71, 128, Ex. C. Plaintiffs allege that most of the information on the SPS website was false and intentionally misleading, and that Malone knew that the services offered by SPS could not benefit customers, but only waste the money of those least able to afford it. *Id.* at ¶ 67, 70, 73-74. For example, Plaintiffs allege that the information referencing "our attorneys" was false because Gembala was the only attorney involved with SPS, and he never performed any work on behalf of customers other than process their payments. *Id.* at ¶ 31. Contrary to the representations on the website, Plaintiffs assert that no one at SPS was trained or experienced, or had any ability to negotiate successfully with lenders. *Id.* at ¶ 67, 70, 73-74.

On or about June 17, 2009, Mrs. Manuel filled out a questionnaire on the website and requested that SPS contact her. Sec. Am. Compl. ¶ 129. Later that day, an employee of SPS named Scott telephoned Plaintiffs from New Jersey. *Id.* at ¶ 130. Mrs. Manuel told Scott that they had tried to get Vanderbilt to reduce their payments, but had been

6

unsuccessful. *Id.* at ¶ 131. Scott told Mrs. Manuel that although their attempt had been unsuccessful, if Plaintiffs paid SPS $895 in advance, Scott could--within thirty to sixty days--reduce their monthly mortgage payments by three hundred dollars. *Id.* at ¶ 132. Plaintiffs agreed to the $895 fee and gave Scott their debit card information over the telephone. *Id.* at ¶ 135-136.

SPS thereafter sent Plaintiffs a package containing various documents. *Id.* at ¶ 139. One such document was a "Check by Phone or Credit Card" authorization form headed "JOSEPH A. GEMBALA, III, & ASSOCIATES" "Secure Property Solutions, LLC/ The Solution to All of Your Real Estate, Mortgage and Investment Needs" at "208 White Horse Pike, Suite 12, Barrington NJ 08007" and contained the following statements: "By my signature, I authorize Joseph A. Gembala, III, & Associates to process payments on my account using the above information."; "ALL PAYMENTS ARE MADE PAYABLE TO: JOSEPH A. GEMBALA, III, & ASSOCIATES"; and "Please Note: Loan Modifications are a 90 to 120 day process." *Id.* at ¶ 140.

On or about July 6, 2009, Defendant Malone's brother, Kevin Malone, one of the principals of SPS, telephoned Plaintiffs and told them that he would be contacting Vanderbilt on their behalf. *Id.* at ¶ 143. Plaintiffs filled out the forms sent to them, including income and expense statements, and returned the documents to SPS on July 28, 2009. *Id.* at ¶ 144.

One or more SPS employees or agents thereafter contacted Vanderbilt regarding Plaintiffs' mortgage. *Id.* at ¶ 146. However, Vanderbilt telephoned Plaintiffs and

informed them that it did not modify its mortgages and that SPS's efforts would be of no use. *Id.* at ¶ 147. When Plaintiffs contacted SPS, Kevin Malone told them that the modification was taking so long because of the large number of applications being processed. *Id.* at ¶ 148. In early October of 2009, Scott telephoned Plaintiffs and informed them that SPS would be issuing a refund, but that it would be slightly delayed by the upcoming Columbus Day holiday. *Id.* at ¶ 149. Upon Plaintiffs' repeated demands for a refund, Scott again telephoned and promised Plaintiffs the refund would arrive soon after November 11, 2009. *Id.* at ¶ 153. The promised refund check never arrived, however. *Id.* at ¶ 153.

Plaintiffs filed their original complaint on January 14, 2010, asserting a federal RICO claim, along with several New Jersey and North Carolina state law claims, all arising out of the alleged mortgage modification scam. The defendants included Gembala, JAGA, SPS, National Mortgage Consultants Group, LLC ("NMCG"), and Custom Asset Solutions, LLC ("CAS"). (DE-1). On February 8, 2010, Plaintiffs amended their complaint to add Malone and Frisch as additional defendants. (DE-7).

On April 13, 2010, Plaintiffs moved to certify a class. On July 2, 2010, the Court directed Plaintiffs to file proof of service as to all defendants who had not yet filed responsive pleadings. Plaintiffs thereafter filed proof of service as to CAS, Malone, and Frisch. Default was entered as to these defendants on July 28, 2010. On September 14, 2010, the Court granted Malone's motion for leave to file an answer and set aside entry of default as to Malone.

8

On September 30, 2010, the Court issued an order addressing several matters. First, the Court dismissed SPS and NMCG from the action for Plaintiffs' failure to achieve service. The Court then denied Plaintiffs' motion to certify a class. Finally, the Court granted Gembala and JAGA's motion to dismiss pursuant to Rule 12(b)(6), dismissing Plaintiffs' claims without prejudice. With the exception of Malone, therefore, all other defendants had either been dismissed or the subject of entry of default.

By motion filed October 20, 2010, Plaintiffs sought leave to file their second amended complaint, naming Gembala, JAGA, Malone, Frisch, and CAS as defendants. Plaintiffs also filed an amended motion to certify a class. The Court allowed Plaintiffs' motion to file the second amended complaint and denied without prejudice Plaintiffs' motion to certify a class as premature. Gembala and JAGA moved to dismiss the second amended complaint on October 4, 2011. Malone filed his motion to dismiss on October 20, 2011. Plaintiffs filed notices of dismissal without prejudice as to defendants CAS and Frisch on October 28, 2011, and as to defendants Gembala and JAGA on May 30, 2012. Malone is therefore the sole remaining defendant in the present action.

Plaintiff's second amended complaint asserts a federal RICO claim, 18 U.S.C. § 1961 *et seq*, as well as various state law claims based on the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 *et seq*, Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, *et seq*, North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1, *et seq*, New Jersey racketeering laws, N.J.S. 2C:41-1, *et seq*, North Carolina racketeering laws, N.C. Gen. Stat. § 75D-1, *et seq*, and common law

fraud. Plaintiffs invoke federal question jurisdiction pursuant to 28 U.S.C. § 1331 based on the federal RICO claim, relying on supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) for the related state law claims.

Malone moves to dismiss the second amended complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. In addition, Malone asserts that Plaintiffs have failed to comply with the pleading standards for Federal Civil Procedure Rules 8 and 9.

Further facts may be set out as necessary to support the recommendation.

## II.    LEGAL BACKGROUND

### A. Rule 12(b)(6): Failure to State a Claim

The purpose of a motion to dismiss, under Federal Rule of Civil Procedure 12(b)(6), is to test the legal sufficiency of the complaint, not to resolve conflicts of fact or to decide the merits of the action. Edwards v. City of Goldsboro, 178 F.3d 231, 243-44 (4th Cir. 1999). The court may dismiss a complaint for failure to state a claim only if "it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). In considering a motion to dismiss, the court assumes the truth of all facts alleged in the complaint and the existence of any fact that can be proved, consistent with the complaint's allegations. See Hishon v. King & Spalding, 467 U.S. 69, 73 (1984); Conley, 355 U.S. at 45-46; Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993). Nevertheless, while the court must take the facts in the light most favorable to the

10

Case 7:10-cv-00004-FL   Document 79   Filed 08/17/12   Page 10 of 20

plaintiff, the court "need not accept the legal conclusions drawn from the facts [or] . . . . unwarranted inferences, unreasonable conclusions, or arguments." Eastern Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship, 213 F.3d 175, 180 (4th Cir. 2000) (citation omitted). Generally, on a motion to dismiss, the court is limited to consideration of the facts alleged in the complaint, exhibits attached to the complaint, and matters of public record. *See* Fed. R. Civ. P. 12(b), 10(c).

**B. Rules 8(a) and 9(b): Pleading Fraud With Particularity**

The sufficiency of a civil RICO claim is judged in accordance with the notice pleading requirement of Rule 8(a), requiring a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). At the same time, however, "where RICO claims are based on predicate acts of fraud, the heightened pleading standard set forth in Rule 9(b) of the Federal Rules of Civil Procedure applies." Field v. GMAC, LLC, 660 F. Supp. 2d 679, 686 (D. Md. 2011) (citing Menasco, Inc. v. Wasserman, 886 F.2d 681, 684 (4th Cir. 1989)); *see also* Riley v. Murdock, 828 F. Supp. 1215, 1225 (E.D.N.C. 1993) ("It is fairly well settled that a civil RICO claim alleging fraud must be pled with particularity as required by Rule 9(b) of the Federal Rules of Civil Procedure."). "[L]ack of compliance with Rule 9(b)'s pleading requirements is treated as a failure to state a claim under Rule 12(b)(6)." Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 783 n.5 (4th Cir. 1999).

Rule 9(b) requires that "in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge,

11

and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). "Although Rule 9(b) does not require the elucidation of every detail of the alleged fraud, it does require more than a bare assertion that such a cause of action exists." Riley, 828 F. Supp. at 1225 (citing Mylan Laboratories, 770 F. Supp. at 1074). Specifically, a plaintiff seeking to establish a prima facie case of fraud must plead "the time, place, and contents of the alleged fraudulent representation, as well as the identity of each person making the misrepresentation and what was obtained thereby." *Id.* "The second sentence of Rule 9(b) allows conclusory allegations of defendant's knowledge as to the true facts and of defendant's intent to deceive." Harrison, 176 F.3d at 784. "A court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial and (2) that [the] plaintiff has substantial prediscovery evidence of those facts." Harrison, 176 F.3d at 784.

### C. Elements of a RICO Claim

Plaintiffs assert claims under RICO subsections (a)[1], (c)[2], and (d)[3]. 18 U.S.C. § 1962(a), (c), (d). To state a claim for a RICO violation, the complaint must set forth facts

---

[1] The elements of a subsection (a) RICO claim are: (1) a receipt of income from a pattern of racketeering activity; and (2) use or investment of the income in an enterprise. 18 U.S.C. § 1962(a); *see also* Busby v. Crown Supply, Inc., 896 F.2d 833, 837 (4th Cir. 1990).

[2] The elements of a subsection (c) RICO claim are: (1) the conduct; (2) of an enterprise; (3) through a pattern of racketeering activity. 18 U.S.C. § 1962(c); *see also* Salinas v. United States, 522 U.S. 52, 63 (1997).

12

which, if proven, would establish "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Morley v. Cohen, 888 F.2d 1006, 1009 (4th Cir. 1989); *see also* Barefoot v. Sec. Credit Corp., No. 5:08-CV-18-BO, 2008 U.S. Dist. LEXIS 92319, at *6 (E.D.N.C. Nov. 12, 2008). "'Enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "Racketeering activity" includes, inter alia, "any act which is indictable" under specifically enumerated criminal provisions, including those relating to mail and wire fraud set forth in 18 U.S.C. §§ 1341, 1343. 18 U.S.C. § 1961(1). Finally, a "'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5).

The Fourth Circuit has stated that RICO liability should be imposed only when there are "ongoing unlawful activities whose scope and persistence pose a special threat to social well-being." Menasco, 886 F.2d at 684. The Fourth Circuit has cautioned against finding a RICO violation in a "garden variety fraud," especially when the alleged pattern of racketeering relies solely on predicate acts of mail or wire fraud. *See, e.g.*, Al-Abood v. El-Shamari, 217 F.3d 225, 238 (4th Cir. 2000) ("[W]e are cautious about basing a

---

[3] Subsection (d) is aimed at conspiracies to violate subsections (a) through (c) of RICO. To allege a subsection (d) claim, plaintiff must allege that "each defendant agreed that another co-conspirator would commit two or more acts of racketeering." U.S. v. Pryba, 900 F.2d 748, 760 (4th Cir. 1990).

13

RICO claim on predicate acts of mail and wire fraud because it will be the unusual fraud that does not enlist the mails and wires in its service at least twice. This caution is designed to preserve a distinction between ordinary or garden-variety fraud claims better prosecuted under state law and cases involving a more serious scope of activity.") (internal quotations and citation omitted); Flip Mortgage Corp. v. McElhone, 841 F.2d 531, 538 (4th Cir. 1988) ("[T]his circuit will not lightly permit ordinary business contract or fraud disputes to be transformed into federal RICO claims [because] . . . the heightened civil and criminal penalties of RICO are reserved for schemes whose scope and persistence set them above the routine.") (internal quotation omitted).

With these legal precepts in mind, the undersigned considers the allegations of the instant complaint.

### III. DISCUSSION

In this case, the parties have focused largely on the issue of whether Plaintiffs have sufficiently pled fraud with particularity, and if so, whether the fraud as alleged states a proper RICO claim. Plaintiffs contend that Malone, Frisch and Gembala operated a wide-spread and extensive scheme to defraud many homeowners, not just themselves, and that this type of activity is properly addressed as a civil RICO claim. Malone argues that Plaintiffs are attempting to elevate into a federal RICO claim a "garden-variety" fraud claim better suited to state court. After careful consideration, the undersigned concludes that Plaintiffs have alleged sufficient facts with particularity to state a federal RICO claim.

14

Viewing all facts in the light most favorable to Plaintiffs, the second amended complaint alleges that Malone and Frisch entered into the April 2009 agreement with Gembala for the sole purpose of operating an unlicensed, illegal, and fraudulent "mortgage modification" business designed to induce struggling homeowners to pay advance fees for "loan negotiation" services they knew would be of no benefit whatsoever to clients. The SPS website falsely advertised, among other things, that SBS had real estate attorneys and negotiators who had helped "countless customers" with their "extensive experience negotiating with banks." In fact, per the allegations, the only attorney connected with SPS was Gembala, and he did not participate in any negotiations on behalf of clients. Rather, Gembala's role was to lend apparent credibility to the scheme as a licensed attorney and to process the advance fees paid by clients, minus a commission. SPS had no attorneys on staff, and no trained personnel capable of successfully negotiating a loan modification on behalf of clients. Nonetheless, the SPS sales representative who contacted Plaintiffs informed them that although previous attempts to negotiate a loan modification with Vanderbilt had been unsuccessful, if Plaintiffs paid $895 in advance, SPS could achieve a three hundred dollar reduction in Plaintiffs' monthly mortgage payments within thirty to sixty days. No loan modification was achieved and no refund was ever given. According to Plaintiffs, hundreds of customers paid SPS for useless mortgage modification services, and at least fifty homeowners lost their homes after they followed SPS's instructions to stop paying their mortgages. In furtherance of the scheme, Plaintiffs allege that SPS committed several

15

criminal acts, including mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, and that the money received was used in part to further the scheme by paying for operating expenses, salaries, and advertising.

Unlike other civil RICO complaints alleging isolated instances of fraud or individual victims, *see, e.g.*, Anderson, 155 F.3d at 506 (holding that a limited scheme to avoid paying compensation due under contract to a single individual did not constitute a RICO violation); Menasco, 886 F.2d at 684-85 (holding that a scheme to defraud only two victims did not constitute a RICO violation but implying that a claim alleging twenty-seven victims of the same scheme would suffice); Flip Mortgage Corp., 841 F.2d at 538 (holding that a fraudulent scheme occurring over several years but impacting only one victim did not constitute a RICO violation), the fraudulent activity alleged by the instant Plaintiffs involves a systematic, ongoing, and deliberate scheme by Malone and others to obtain advance payments from hundreds of homeowners in exchange for empty promises to achieve reduced mortgage payments or lower interest rates. Such allegations describe "ongoing unlawful activities whose scope and persistence pose a special threat to social well-being" and raise the instant complaint above "garden-variety fraud." Menasco, 886 F.2d at 684. Indeed, Plaintiffs allege that in August 2008, the New Jersey Department of Banking and Insurance ("NCDBI") was sufficiently concerned about the threat to the consuming public posed by such "loan modification services" that it published a "Warning Regarding Mortgage Loan Modification Activity," noting that for-profit operations claiming the ability to modify mortgages were illegal without the proper

licensing, and specifically cautioning: "The Department has also seen solicitations to licensees and to attorneys to partner with companies that purport to offer such services." Sec. Am. Compl. ¶ 22; Ex. A at 6-7. To address mortgage modification fraud activity, NJDBI issued Bulletin 08-13 on July 28, 2008 and Bulletin 08-27 on December 19, 2008, warning that: "Any violators are subject to Departmental actions for fines and injunctive relief, criminal prosecution under N.J.S.A. 2C:21-19f, and civil lawsuits including actions under the Consumer Fraud Act." *Id.* at ¶ 23; Exh. A at 10. These warnings underscore the wide-spread harm inflicted by loan modification schemes and the accompanying threat to social stability and well-being caused by such fraud. Accordingly, the undersigned concludes that Plaintiffs have sufficiently pled a federal RICO claim.

Malone contends Plaintiffs have failed to plead fraud with particularity because neither the Gembala website nor the SPS website actually promised Plaintiffs they would receive a loan modification, only that it was a possibility. As such, contends Malone, Plaintiffs have failed to show they were misled by any false statements. Further, even if the websites were misleading or fraudulent, Malone argues there is no allegation that Plaintiffs specifically relied upon such misrepresentations before purchasing the mortgage modification services. Moreover, because he never directly spoke with Plaintiffs, and because the second amended complaint does not allege that he was directly responsible for representations on the SPS website, Malone argues Plaintiffs fail to allege that he was responsible for any possible fraud. Finally, because a representative of SPS

contacted Vanderbilt on Plaintiffs' behalf, Malone argues Plaintiffs have failed to show that any fraud occurred. These arguments are unpersuasive.

Although the SPS website does not guarantee loan modification, it nevertheless contains numerous statements plainly indicating that purchasing loan modification services from SPS could be beneficial, when in actuality, SPS's services were worthless. For example, the website states that "[t]ogether Joseph A. Gembala, III & Associates and the processing center, Secure Property Solutions, LLC, have helped countless homeowners during this difficult time through the process of a loan modification"; "[o]ur attorneys and negotiators have extensive experience negotiating with banks and they understand state and federal laws as well as lending regulations"; "[o]ur attorneys can use the Truth in Lending Act (TILA) and the Real Estate and Settlement Procedures Act (RESPA) to your advantage"; and "Contact Secure Property Solutions to stop the foreclosure process and save your home. Our experienced team will gather all of the necessary information to present your case to the lender's loss mitigation negotiator and work diligently to achieve a successful loan modification in a fast and efficient manner." Plaintiffs allege that all of these representations are false, and that SPS had only untrained sales representatives with no ability to successfully achieve a loan modification. Moreover, when the SPS representative contacted Plaintiffs, he specifically told them that SPS could obtain a three hundred dollar reduction in their monthly mortgage payments. Plaintiffs allege they relied on these representations in agreeing to purchase mortgage modification services from SPS. Although Plaintiffs never spoke directly to Malone, the

18

second amended complaint alleges that Malone founded and was the fifty percent owner of SPS; he also managed SPS's day-to-day activities, hired, fired, and supervised SPS employees, and maintained SPS's New Jersey office and the equipment and customer files therein. The complaint further alleges that Malone purposefully entered into the 2009 agreement with Gembala and Frisch to operate the loan modification business although he knew that the business was unlicensed, illegal, and harmful to the public. In addition, Plaintiffs allege that Malone was responsible for the misrepresentations on the SPS website. Sec. Am. Compl. ¶ 64. As such, Malone cannot credibly divorce himself from the fraudulent statements conveyed to Plaintiffs through the SPS website or by SPS sales representatives. And while Plaintiffs allege that an SPS representative did in fact contact Vanderbilt on their behalf, they also allege that no one at SPS had any ability to successfully negotiate for a loan modification, and that Malone knew that the services offered by SPS were worthless.

"A court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial and (2) that [the] plaintiff has substantial prediscovery evidence of those facts." Harrison, 176 F.3d at 784. Accepting Plaintiffs' allegations as true, they have provided ample details of the particular circumstances of the alleged fraud perpetrated by Malone, as well as substantial prediscovery evidence. Because they have pled fraud with sufficient particularity, the undersigned concludes that the motion to dismiss Plaintiff's second amended complaint should be denied. Barefoot,

No. 5:08-CV-18-BO, 2008 U.S. Dist. LEXIS 92319, at *18 (denying the defendants' motion to dismiss the plaintiff's RICO complaint). The sufficiency of the pleadings also extends to Plaintiff's state law claims, should the Court decide to exercise supplemental jurisdiction.

## IV. CONCLUSION

For the foregoing reasons, the undersigned RECOMMENDS that the motion to dismiss (DE-69) by Defendants Joseph A. Gembala, III and Joseph A. Gembala, III & Associates be GRANTED and the second amended complaint be DISMISSED without prejudice to Plaintiffs as to Defendants Joseph A. Gembala, III and Joseph A. Gembala, III & Associates. The undersigned further RECOMMENDS that the motion to dismiss (DE-71) by Defendant Michael Malone be DENIED.

SO RECOMMENDED in Chambers at Raleigh, North Carolina this 17th day of August, 2012.

_____
WILLIAM A. WEBB
UNITED STATES MAGISTRATE JUDGE